DAVISON, C. J., and HALLEY, JOHNSON, BLACKBIRD, JACKSON, IRWIN and BERRY, JJ., concur.

**Jimmie JOHNSON, Plaintiff in Error,**
**v.**
**STATE of Oklahoma, Defendant in Error.**
**No. A–12709.**

Court of Criminal Appeals of Oklahoma.
April 22, 1959.

Jimmie Johnson, McAlester, plaintiff in error, pro se.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

Jimmie Johnson, plaintiff in error, hereinafter referred to as defendant, was charged in the district court of Garfield County with the crime of forgery, after prior conviction of the crime of forgery.

In the information, after alleging the prior conviction of a felony, it was set out:

"* * * that the said Jimmie Johnson on or about the 23rd day of August, 1958, in said county of Garfield and State of Oklahoma, did then and there unlawfully, wilfully, wrongfully and feloniously sell, exchange and deliver to International Paper Company, Enid, Oklahoma, for the consideration of the sum of $81.50 in good and lawful money of the United States of America, a certain forged and counterfeited instrument, to-wit: a check, which check is in words and figures as follows, to-wit:

"Central National Bank    Enid, Oklahoma  8-24-1958
"Pay to the order of Jimmie Johnson $81.50
"Eighty-one.........50/100.........Dollars
                    "/s/ L. J. Davis

the said defendant then and there knowing the same to be false, forged and counterfeited; the signature of the said L. J. Davis upon said check was not the true and genuine signature of the said L. J. Davis but was false and fictitious which the said defendant then and there well knew, the said signature of the said L. J. Davis having been unlawfully, wilfully, fraudulently and feloniously forged on said check as was known by said defendant, but the said defendant did then and there unlawfully, knowingly, wilfully, fraudulently and feloniously sell, exchange, deliver, utter and pass said forged and counterfeited instrument as aforesaid, with the unlawful, fraudulent and felonious intent then and there upon the part of the said defendant to beat, cheat and defraud the said International Paper Company of Enid, Oklahoma, out of the sum of $81.50 in good and lawful money of the United States of America."

On November 17, 1958, the day before the case was set for trial, the court had the defendant brought into court to inquire about his negotiations with an Oklahoma City attorney to represent him, and was advised by defendant that he had in his possession a letter from the Oklahoma City attorney advising him that he could not get to his case until December 15, 1958. Defendant wanted the case continued, but the court stated that the term of court would

be over before December 15, and proposed to appoint an attorney for defendant from the Garfield County bar. Defendant, under the circumstances, suggested that Mr. J. Russell Swanson, of the Enid Bar, represent him, and the court made the appointment at the expense of Garfield County. Thereafter Mr. Swanson moved ·that the case be continued because one Bill Layton, who then was some place in Kansas, was a material witness; that the evidence would develop that said Layton had delivered the check in question to defendant as having been sent to him by one L. J. Davis, the purported drawee. And it was further alleged that L. J. Davis in fact was at the time indebted to defendant, and that he had no reason to not believe the check was intended for him. The court overruled the motion and the case came on for trial.

The defendant was found guilty by the jury, who left the punishment to be fixed by the court, and he assessed a penalty of ten years' confinement in the State penitentiary, the minimum for conviction under the habitual criminal law. 21 O.S.1951 §§ 1577, 1621; 21 O.S.1951 § 51, subd. 1.

■ Mr. Swanson perfected the appeal for the defendant, but did not file a brief. The record was prepared at the expense of Garfield County, and we permitted the appeal to be filed in this court without cost to the defendant.

Ordinarily, under such circumstances, we examine the record for fundamental error, and if none found, summarily affirm the judgment. We have found no fundamental error here, but by reason of a study of the motion for new trial, and petition in error, have decided to summarize the evidence at trial, and on motion for new trial.

Bernice Welch, employee and head bookkeeper of the International Paper Company at Enid, testified that on Saturday, August 23, 1958 the defendant, whom she identified, presented to her the check described in the information, and which she identified to have been cashed; that she did not know the defendant but did know the purported drawee of the check, L. J. Davis, who was generally known as Leo Jack Davis, and that she asked defendant if the L. J. Davis whose name appeared on the check was Leo Jack Davis, and on being informed that such was a fact, she proceeded to give defendant $81.50 in cash, the face amount of the check, after she witnessed defendant endorse such check. She said that the bank credited the account of her firm with the face amount of the check, but subsequently they had to repay the bank on account of the check being turned down by the bank as not drawn by Leo J. Davis, their depositor.

Kenneth Kendrick, manager of the International Paper Company at Enid testified that Leo Jack Davis had been a customer of his company over a period of years. He testified ·that although his firm was given credit for the check signed "L. J. Davis" that it was subsequently charged back to them.

Leo J. Davis testified and said that his full name was Leo Jack Davis; that he was a second-hand truck dealer; that he had known the defendant Jimmie Johnson for three or four years; that at one time one of his mechanics sent defendant to Wichita to drive a truck back, but paid his expenses and a fee on his delivery of the truck; that about a year and a half previously defendant worked for a short time for another company witness was interested in, in that such company employed defendant to drive a truck to California. Witness said that defendant was fully paid for such services, and that he had performed no other services and witness was not indebted to defendant in any amount. He denied sending to defendant the $81.50 check that had been cashed by the International Paper Company made payable to Jimmie Johnson, and that bore the purported signature of witness.

Witness said that he had an account at the Central National Bank, Enid, when the check was presented for payment, but that his signature card was not in the name of "L. J. Davis", but "Leo J. Davis", and the check in question was therefore not charged to his account, being an improper signature.

Witness further said that he had known a man by the name of Bill Layton, but had never authorized him to deliver a check to defendant in any amount. He said Layton worked for him back in May, 1958.

On cross-examination witness admitted that defendant came to him once to purchase a trailer, but defendant could not raise the money, and that defendant was to get some person to buy it for him, but never did.

Loyd Randolph, cashier of the Central National Bank, Enid, testified that Leo Jack Davis carried an account in his Bank; that he signed his checks "Leo J. Davis". He examined the $81.50 check, State's Exhibit 1, and said that he did not recognize the signature; that it was not the signature of his customer, and that his Bank had refused to charge it to the account of Leo J. Davis and the check was returned to the International Paper Company with the notation, "Unable to locate", which was the same as a notation, "No account". He identified the genuine signature of Leo J. Davis, and the signature card was admitted into evidence.

Glenn Garren, deputy sheriff, testified that when defendant was booked into the Garfield County jail he gave defendant a receipt for a Michigan chauffeur's license, a New Mexico license, and a Kansas license; also a doctor's certificate, all purporting to bear the signature of Jimmie Johnson.

Robert L. Travis, document examiner for the Oklahoma State Bureau of Investigation, qualified as a handwriting expert, and swore that he had examined the endorsement of "Jimmie Johnson" on the $81.50 check, State's Exhibit 1, and compared it with the signature on the three driver's licenses and the doctor's certificate, testified to by officer Garren, and in his opinion the signatures were made by the same person.

T. E. Miller, court clerk of Garfield County testified that he was so employed in September, 1956 and that Jimmie Johnson, whom he identified as the defendant, was charged in the district court of Garfield County in case No. 2143 with forgery, a felony, was convicted and sentenced to serve two years in the State Penitentiary at McAlester. He identified the information and judgment, sentence, and the receipt of the Warden for the prisoner.

Lelon Coyle, former sheriff of Garfield County testified that he delivered defendant to the State Penitentiary at McAlester by reason of the conviction testified to by the court clerk, and received the receipt in question for the defendant.

This completed the evidence for the State. The defendant did not testify, and offered no evidence.

We have carefully examined the instructions to the jury. Counsel for the defendant requested several instructions. On the face they purport to have been signed by the trial judge, and we would assume were given, except in motion for new trial complaint is made of the failure of the trial judge to give requested instructions.

On motion for new trial there was evidence and discussion presented by the reporter involving paragraphs 7 and 8 of the motion for new trial reading:

"7. Error of the court in conversing with individual jurors about certain exhibits introduced by plaintiff in said trial, such conversation taking place while the court was in recess and out of the presence of defendant or defense counsel.

"8. Error of the court in making comments in open court and after closing arguments of counsel concerning certain exhibits, as mentioned in No. 7, and suggesting to the jury that such exhibits should be taken by the jury to the jury room, such comments coming immediately following the county attorney's closing argument in which he had mentioned and discussed such exhibits and thereby emphasizing and giving undue weight to both the argument of the county attorney and to the particular exhibits and evidence commented on."

The Court at the hearing stated:

"The Court: No. 7—Mr. Swanson, that statement is just a plain, unadulterated falsehood. The court did not talk with certain jurors with reference to certain exhibits during the trial. What happened was one of the jurors, just as the jury was going out, just made the statement—he handed the exhibit to someone and said 'all the jurors have not seen all those exhibits', so the court just told them to go on out. The defendant was present in the court room and I thought you were. I'm not sure. I know he was here.

"Mr. Swanson: That allegation is based entirely on remarks made by the court later. I had no actual knowledge of the incident itself. I don't know when, where and how."

The court went on to say that he had no conversation. Then the following:

"Mr. Swanson: That is based entirely upon the statement your Honor made at the close of the argument when you said some of the jurors had called to your attention—I don't recall the exact words—that they had not seen the exhibits, and some kind of conversation which obviously hadn't taken place during the trial itself.

"The Court: As the jurors went out the exhibit was handed to someone and one of the jurors said, 'all the jurors haven't seen that,' or words to that effect. When they came back in —as I said, the incident kind of slipped my mind. I recall this juror had made the statement from the jury box and I asked the jurors if some of them had not seen the exhibit and I recall some of them held their hands up and said they had not seen them. Is that correct?

"Mr. Swanson: I believe that is correct.

"The Court: There were four of them, but the court held no private conversations with the jurors. It was all done right in here.

"Mr. Buchanan: If the court please, it is proper that the jury should consider the exhibits when they are admitted. I think maybe Mr. Johnson here knows about it.

"The Court: I will ask you. Do you remember about the juror saying that some of them hadn't seen some of them?

"Mr. Johnson: There were four of them held their hands up that hadn't seen it.

"The Court: I mean when one juror made the statement going out. Did you hear one of the jurors say some of them hadn't seen the exhibits?

"Mr. Johnson: Yes.

"The Court: Tell your attorney about what happened, if you will.

"Mr. Johnson: As he started out he said, 'if you haven't seen them and would like to look at them—.'

"The Court: That's the way I remember it exactly.

"Mr. Swanson: I don't claim to know. I didn't see or hear. It was based on the remarks later there had been some mention of it. Naturally I assumed something had been said.

"The Court: Your client remembers. He has related it exactly.

"Mr. Swanson: No. 8; after the arguments were over and even the closing argument of the prosecution was completed, then the court did mention certain exhibits that had not been seen and asked if they would like to see them and suggested that they take them to the jury room.

"The Court: That's not true. I just mentioned the exhibits.

*    *    *    *    *    *

"Mr. Swanson: I believe at the close of the argument there were remarks made. Mr. Pope, in the final part of his argument, was referring to exhibits offered and then upon the close of his argument the court made mention of the fact that it had come to

your attention that some of them had not seen the exhibits and that they could be taken to the jury room. I believe, to go on farther, you first asked both attorneys if there was any objection to taking them to the jury room, but all of that together I feel did emphasize or overemphasize certain exhibits.

"The Court: Again your memory is pretty faulty. What actually happened was this: The court did state that it had been called to his attention by one or more jurors that some of the jurors hadn't seen the exhibits and the court stated that they would either have to be passed to the jurors before they went to the jury room, or they would have to take them to the jury room, and the court asked the jurors if there was any of them who had not seen some of the exhibits and I am sure that Mr. Johnson stated correctly there were four jurors that said they hadn't seen some of the exhibits. I am not sure; not one hundred per cent clear on just what the next statement was, but the sum and substance of it was that the attorneys were asked if there was any objection to the taking of the exhibits to the jury room and I am giving my recollection to it there was no objection so the court then directed that the exhibits be taken to the jury room. Now that's my memory of it. If I am in error about it, Mr. Swanson, I apologize to you, because I am giving it from memory, but I don't like to have something go into the Criminal Court of Appeals of this State indicating that I preside stupidly, because I don't think I did."

Counsel for the defendant stated that so far as he knew, no appeal was contemplated, nevertheless the trial court requested Mr. Swanson to perfect appeal, and the court ordered a record at the expense of Garfield County, as indicated.

While we commend court-appointed counsel for vigorously defending the appellant, we particularly commend the trial judge for his fairness in conducting the trial, and his painstaking efforts to afford the defendant due process.

 Finding no fundamental error, the case must be, and is affirmed. Fitzgerald v. State, 77 Okl.Cr. 409, 142 P.2d 131.

NIX and BRETT, JJ., concur.